GRAND-KAHN ELECTRIC, INC., Plaintiff, *v.* TRANSPORTATION BUILDING CORPORATION OF CHICAGO *et al.*, Defendants.

BELL FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff, *v.* TRANSPORTATION BUILDING CORPORATION OF CHICAGO *et al.*, Defendants.

QUALITY REFRIGERATION AND AIR CONDITIONING CO., INC. *et al.*, Third-Party Plaintiffs-Appellants, *v.* CHICAGO CITY BANK AND TRUST COMPANY, Third-Party Defendant-Appellee.

(No. 57505;

First District (5th Division)—October 19, 1973.

Petit, Safeblade, Littlejohn & Glass and Asher, Greenfield, Gubbins & Segall, both of Chicago, for appellants.

Moses, Gibbons, Abramson & Fox, of Chicago, for appellee.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

Quality Refrigeration and Air Conditioning Co., Inc. (Quality), and *Mid States Air Conditioning Equipment, Inc. (Mid States)*, third-party plaintiffs, appeal the trial court's order dismissing their amended and supplemental third-party complaint. The underlying action with which the third-party actions were consolidated, had been brought to foreclose a mortgage and a mechanic's lien against the Transportation Building and is not here involved.

The facts which follow are those alleged in the third-party complaints.

While the foreclosure suits were pending, Quality was negotiating with Illiana Corporation, a long-term lessee of the Transportation Building, and Sherman Construction Co., a general contractor, for the installation of 45 Typhoon air conditioning units. Pursuant thereto, Quality received a quotation of $146,300 for the units (later reduced to $118,000) from the Typhoon distributor, Mid States. The quotation, however, was on the condition that there be a firm and unconditional commitment by a Chicago bank or lending institution to pay for the units within 30 days of billing. Similarly, while Quality was negotiating a total contract of $414,000 for the air conditioning units and installation with Illiana and Sherman, it had advised Illiana and Sherman

"* * * it was unwilling to enter into a contract with them for for such installation, and that Mid States had informed it that Mid States was unwilling to supply said Typhoon air conditioning units, unless they were assured of their respective payments out of a firm loan commitment to Illiana from a Chicago bank or lending institution, Quality to be paid monthly 80% for work and material furnished and Mid States to be paid said sum of $146,-300.00 within 30 days from billing."

Subsequently, a document dated February 21, 1969, but not signed until mid-March of that year, between Quality, Illiana and Sherman contained the following language:

"The terms of payment shall be as follows: The total amount of $414,400.00 shall be available from an open loan held by and in a Chicago bank or lending institution and said amount shall be specifically allocated for Quality Refrigeration and Air Conditioning Co. Inc., general contractor's sworn affidavit setting forth that Quality Refrigeration and Air Conditioning Co. Inc. is the air conditioning contractor for the above described job and has said amount due them, all monies due under this contract shall be released by said bank, directly to Quality Refrigeration and Air Conditioning Co. Inc. on the following terms:

(Interim payments of 80% described)
* * *

Notwithstanding, the preceding paragraph relating to interim payments, it is specifically agreed by and between all the parties hereto that upon delivery of the 45 Typhoon air conditioning units to 608 South Dearborn Buildings, a payout of $146,300.00 shall be released, made out to Quality Refrigeration and Air Conditioning Co. Inc. on or before 30 days from the date of invoice billing for said equipment from Mid States Air Conditioning Equipment Inc.

to Quality Refrigeration and Air Conditioning Co. Inc.

A final payment of the total balance due shall be made on or before June 10, 1969, or within ten days after completion of our contract, whichever is the latter."

On March 1, 1969, a first mortgage leasehold commitment for $2,650,-000 was executed between Chicago City Bank and Illiana, in consideration of $53,000 paid to the bank by Illiana. That commitment provided that approximately $2,000,000 of the total amount would be used for remodeling of the Transportation Building for occupancy by the U.S. Government under a sublease.

Illiana and Sherman then informed Quality that a firm loan commitment had been obtained from Chicago City. Thereupon, based on oral assurances from Chicago City Bank to Quality that the air conditioners and work would be paid for when installed, Quality and Mid States entered into an oral agreement with the bank to proceed with delivery and installation of the 45 air conditioning units.

When the units arrived in early April, 1969, Quality informed the bank of their arrival and again asked for assurance that it would be paid because Mid States hesitated to make delivery unless it knew the money was available for payment by the bank. On April 7, 1969, the following letter was sent to the president of Quality from the bank:

"Re: The Transportation Building

Dear Mr. Najman:

This letter will advise you that under the terms of our commitment to Illiana Corporation, the owners of the subject building, there will be, no sooner than June 1 and no later than June 30, funds available to pay in full all construction costs incurred in the rehabilitation of the subject building.

We have been informed that your contract on the air conditioning work is $425,000; and, if not sooner paid, you will receive same on the date of disbursement as indicated above on presentation of a waiver of lien and affidavit on Chicago Title and Trust Company, Standard Form. You are further advised that the subject Company is trying to arrange interim financing and that if same is arranged, you should be paid on a standard construction draw basis."

At about the same time the letter was sent, Mid States received additional oral assurances directly from the bank that payment would be made by the bank, and, because of those assurances, delivered the air conditioning units to the building. When the work was approximately 80% complete, Quality ceased work because the bank refused to pay. In June, Mid States tendered the bank a waiver of lien, a Chicago Title and

Trust Company standard form of affidavit, and delivery receipts for the units, as required by the bank's letter quoted above, and remanded payment. The bank refused to pay.

From defendant's motion to strike and dismiss, it appears that the commitment between the bank and Illiana was based on the belief that the General Services Administration was expected to move into the Transportation Building and, when it failed to do so, the end mortgage on the building was not funded and foreclosure proceedings resulted. It further appears, however, that neither Quality nor Mid States received copies of the bank's agreement with Illiana, or learned of the full provisions and conditions thereof, until late November, 1971, after the amended third party complaint had been filed, and some 2½ years after the bank's letter to Quality.

On March 2, 1972, plaintiff's amended and supplemental third party complaint was dismissed because, in the view of the trial court, the April 7, 1969 letter between the bank and Quality "was a conditional commitment, and not an unconditional commitment and, accordingly, not binding on the bank. That Quality was indebted to Mid States on 4/7/69, under Mid States invoice to Quality of 3/26/69 and being so indebted an oral commitment of the Bank to pay the debt of Quality is barred by the Statute of Frauds, Ch. 59, Sec. 1—Ill. Rev. Stat."

OPINION

On oral argument, there was agreement that if there is an obligation of the bank to Quality, it must have originated from the bank's April 7, 1969 letter to Quality.

First, we believe it is important to consider the context in which the letter was written. In October and November, 1968, an action to foreclose a mechanic's lien and one to foreclose a $626,545.92 first mortgage had been filed. The General Services Administration was expected to move into the building and thereby ease its financial straits. Apparently, before GSA would take over the space, it had to be updated, and the air conditioning units were part of the renovation process. Knowing of the financial problems the building was having, Quality and Mid States sought assurances of payment from Illiana, who, on March 1, 1969, had obtained a first mortgage leasehold commitment from Chicago City Bank. They also sought assurances from Sherman, the general contractor. The resulting contract referred to earlier, although dated February 21, 1969, was actually signed sometime in March, after the bank's commitment was made to Illiana. Under the terms of that contract, an amount of $414,400 was to be available from the loan Illiana secured from a Chicago bank or lending institution. That amount was to be specifically allocated for Quality and was to "be released by said bank directly to

Quality Refrigeration and Air Conditioning Co., Inc." Further, the agreement provided that upon delivery of the air conditioning units, "a payout of $146,300.000 shall be released, made out to Quality * * *."

The mortgage agreement between Illiana and the bank referred to in the April 7, 1969 letter from the bank to Quality, acknowledged that "[B]orrower (Illiana) has represented and warranted that approximately $2,000,000 of the loan proceeds will be used for paying the costs of remodeling of the improvements located on the leasehold estate * * *."

Without knowledge of the full extent of Illiana's agreement with the bank, but with full knowledge of Illiana's contract with Quality, the latter, on or about April 7, 1967, sought more direct reassurance from the only party remaining who could insure payment, i.e., Chicago City Bank, the "Chicago Bank or lending institution" which held the amount "specifically allocated for Quality Refrigeration and Air Conditioning Co., Inc." under Illiana's agreement with Quality.

Although the first paragraph of the April letter, which followed the oral assurance, referred to the bank's agreement with Illiana (to which Quality was not privy), it also appears to assure Mr. Robert Najman, President of Quality, in accordance with the alleged oral agreement, that the bank would make sufficient funds available to pay for all costs incurred in the rehabilitation of the Transportation Building, including the cost of air conditioning.

The second paragraph appears to promise payment of $425,000 to Quality on the date of disbursement (as early as June 1 but not later than June 30) as soon as a waiver and affidavit were presented, but, if interim financing were arranged for Illiana, then payment was still assured, but "on a standard construction draw basis."

The parties take conflicting views as to the meaning of the preliminary language in the first paragraph of the letter, specifically the clause "under the terms of our commitment to Illiana Corporation." The bank takes the position that the letter merely refers to and relies upon the conditions of the bank's commitment to Illiana, which was totally independent of any agreement Illiana had with either Quality or Mid States, and, the letter being so conditioned, it was not a promise to pay either Quality or Mid States for the air conditioning work. The latter parties raise the contention that, since they had orally made their position known to the bank, this clause in the letter simply advised them that under the terms of the bank's commitment to Illiana (to which they were not parties and with the terms of which they were not acquainted,) the situation was such that if they would proceed with the installation, their demand for direct payment by the bank would be met.

585

Implicit in the trial court's dismissal of the complaint is the conclusion that the bank's letter of April 7 is unambiguous; that it means what the bank says it means; and that, therefore, the allegations concerning conversations between Quality, Mid States and the bank about assurance of payment by the bank before they would do the air conditioning work could never be proved because of the parol evidence rule, with the result that the complaint did not state a provable cause of action. We cannot agree, as it seems to us that by virtue of the clause referred to above, the letter, taken by itself, is inherently ambiguous, that its correct interpretation could be ascertained only by preliminary consideration of parol evidence (if it exists) in support of the allegations in the complaint on which Quality and Mid States rely to establish a firm commitment by the bank based only on conditions which they allege were performed.

Considering all of the facts alleged and all reasonable inferences which may be drawn therefrom (*Psyhogios v. Village of Skokie*, 4 Ill.App.3d 186, 280 N.E.2d 552), we believe the trial court erred when it dismissed the amended and supplemental third-party complaint. The order of dismissal is therefore reversed and the cause remanded for trial. If, at trial, it should be determined that the April 7 letter did, in fact, create a firm agreement by the bank to pay Quality as alleged, then no question would arise involving the Statute of Frauds.

Reversed and remanded for trial.

LORENZ and SULLIVAN, JJ., concur.